```
FILED by____TB____D.C.

Sep 21, 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. –MIAMI
```

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
# 16-20706-CR-MARTINEZ/GOODMAN
#### CASE NO. _____

18 U.S.C. § 371
18 U.S.C. § 981(a)(1)(C)

**UNITED STATES OF AMERICA**

vs.

**SHELDON R. ROSE and
IAN C. KASS,**

    **Defendants.**

_____/

### INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At times material to this Information:

1.    Defendant **SHELDON R. ROSE** was a resident of Sarasota, Florida, and acted as a promoter and accountant for companies that were registered to do business in the State of Florida.

2.    Defendant **IAN C. KASS** was a registered securities representative who conducted business in Ft. Lauderdale, Florida, and acted as a representative of various broker-dealers.

3.    Conspirator Steven Sanders was a resident of Lake Worth, Florida, and acted as a promoter for companies that were registered to do business in the State of Florida.

4.    Conspirator Alvin S. Mirman was a resident of Sarasota, Florida, and acted as a promoter for companies that were registered to do business in the State of Florida.

5.    Conspirator Daniel McKelvey was a resident of Foster City, California, and acted as a promoter for companies that were registered to do business in the State of Florida.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _____

18 U.S.C. § 371
18 U.S.C. § 981(a)(1)(C)

UNITED STATES OF AMERICA

vs.

SHELDON R. ROSE and
IAN C. KASS,

      Defendants.

_____/

## INFORMATION

The United States Attorney charges that:

## GENERAL ALLEGATIONS

At times material to this Information:

1.      Defendant **SHELDON R. ROSE** was a resident of Sarasota, Florida, and acted as a promoter and accountant for companies that were registered to do business in the State of Florida.

2.      Defendant **IAN C. KASS** was a registered securities representative who conducted business in Ft. Lauderdale, Florida, and acted as a representative of various broker-dealers.

3.      Conspirator Steven Sanders was a resident of Lake Worth, Florida, and acted as a promoter for companies that were registered to do business in the State of Florida.

4.      Conspirator Alvin S. Mirman was a resident of Sarasota, Florida, and acted as a promoter for companies that were registered to do business in the State of Florida.

5.      Conspirator Daniel McKelvey was a resident of Foster City, California, and acted as a promoter for companies that were registered to do business in the State of Florida.

6.    Conspirator A was an attorney licensed in Florida who conducted business in Boca Raton, Florida.

7.    Conspirator B was an attorney licensed in New York who was a principal of Law Firm A, which conducted business in New York, New York.

8.    Conspirator C was an attorney licensed in New York who was an employee of Law Firm A.

9.    The U.S. Securities and Exchange Commission ("SEC") was an agency of the United States responsible for enforcing the securities laws.

10.    A Form S-1 registration statement was required to be filed with the SEC in order for a company to issue stock, or "securities," to the public.   The Form S-1 was required to disclose, among other things, the role of any promoter or officer, and the financial condition and results of operations of the company.    Once a company's registration was deemed effective, it was required to file periodic and annual reports with the SEC on Forms 8-K, 10-K, and 10-Q.

11.    Shares of publicly traded companies (known as "issuers") that were not registered with the SEC generally could not be sold to the public.   Such shares were generally considered "restricted."    However, Rule 144 of the Rules and Regulations promulgated by the SEC ("Rule 144") permitted the sale of restricted securities in certain circumstances.    One of the conditions necessary for reliance on Rule 144 was that the issuer was not, and had never been, a "shell company."    A "shell company" was a company with no or nominal operations and no or nominal non-cash assets.    Another requirement for relying on Rule 144 was that the seller of the securities was not an "affiliate."    An "affiliate" was a person that directly, or indirectly through one or more intermediaries, controlled, or was controlled by, or was under common control with, the issuer. Any relative or spouse of an "affiliate" was also deemed an "affiliate."    A further requirement for

2

reliance on Rule 144 was that restricted stock must be held for at least one year after being acquired from an issuer or an affiliate of an issuer before it could be sold into the market.   Shares that were not "restricted" generally were considered "free trading."

12.      Premier Nursing Products Corp.; We Sell For U Corp.; Pashmina Depot.com Inc.; Liquid Financial Engines, Inc.; Mobieyes Software, Inc.; mBeach Software, Inc.; MIB Digital, Inc.; Intake Communications, Inc.; Teaching Time, Inc.; Hidden Ladder, Inc.; BCS Solutions, Inc.; Benefit Solutions Outsourcing, Corp.; Big Clix, Inc.; mLight Tech, Inc.; Blue Sun Media, Inc.; Blue Flash Communications, Inc.; FanSport, Inc.; ShopEye, Inc.; Mobile Vault, Inc.; Diamond Lane, Inc.; Sunchip Technology, Inc.; Rainbow Coral Corp.; First Titan Corp.; Neutra Corp.; Aristocrat Group Corp.; First Social Network Corp.; E-Waste Corp.; First Independence Corp.; Universal Technology Systems Corp.; Changing Technologies, Inc.; XtraSafe, Inc.; Global Group Enterprises Corp.; Envoy Group Corp., Visual Acumen, Inc., First Xeris Corp., and Orion Global Corp. were shell companies (collectively, the "Shell Companies").

13.     A "straw CEO" was an individual who, in exchange for a fee, allowed his name to be listed as a chief executive officer on corporate paperwork.   A "straw shareholder" was an individual who, in exchange for a fee, allowed his name to be listed on corporate paperwork as a shareholder of one of the Shell Companies.

14.     Shares issued directly by the Shell Companies were restricted at the time they were initially issued, and therefore unable to be sold in the public marketplace unless (a) the restrictive legends were removed from the stock certificates by the transfer agent, and (b) brokerage firms accepted the shares for deposit and sale.   Rule 144 provided an exemption for the removal of restrictive legends.   To take advantage of the Rule 144 exemption, however, the transfer agent generally required a legal opinion letter stating that the conditions of Rule 144 have been met.

Moreover, before stock was accepted for deposit and sale by a brokerage firm, the firm often required a similar legal opinion letter.

15.     A "beneficial owner," as defined under the rules of the SEC, included any person who directly or indirectly shared voting power or investment power (the power to sell a security). When a person or group of persons acquired beneficial ownership of more than 5% of a voting class of a company's shares registered under Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, they were required to file a Schedule 13D with the SEC.    Schedule 13D reported the acquisition of the shares and other information, and any material changes in the facts contained in the schedule required a prompt amendment.

16.     In a "reverse merger," a private company acquired a majority of the shares of a public shell company, which was then merged with the purchasing entity.    The public shell company was required to report the terms of a reverse merger in a Form 8-K filing with the SEC, including all related transactions.

17.     "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which have a low market capitalization.    Microcap stocks were often traded via the OTC Bulletin Board or pink sheet markets and were subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

18.     The Financial Industry Regulatory Authority ("FINRA") was a self-regulatory authority responsible for writing and enforcing securities rules for broker-dealers and registered securities representatives.    A company was required to obtain approval from FINRA before microcap or penny stock shares could be traded via the OTC Bulletin Board or pink sheet markets.

An application on Form 211 was required to be filed with FINRA, and was required to be submitted by a registered securities representative on behalf of the company, in order to obtain such approval.

19.     "Wash trades" were purchases and sales of securities that matched each other in price, volume and time of execution, and involved no change in beneficial ownership.   "Matched trades" were similar to wash trades but involved a related third person or party who placed one side of the trade.   Both wash trades and matched trades were manipulation techniques used to create the false appearance that the stock price and volume rose as a result of genuine market supply and demand for the securities.   Matched trades were also used to transfer ownership or control of the shares at a prearranged price from one individual to another, while giving the appearance of legitimate market activity.

20.     A "pump and dump" scheme was a scheme where a group of individuals who controlled the free trading or allegedly unrestricted shares of a microcap company fraudulently inflated the share price and trading volume of the company through, among other things, wash and matched trades, false and misleading press releases, and paid stock promotions.   When the company's share price reached desirable levels, the individuals sold their free trading shares for substantial financial gain.

## CONSPIRACY TO COMMIT SECURITIES FRAUD
### (18 U.S.C. § 371)

From in or around January 2007, through in or around January 2014, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**SHELDON R. ROSE and
IAN C. KASS,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and others to commit certain offenses

against the United States, that is, to knowingly, willfully, and unlawfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, and (a) employ a device, scheme and artifice to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon any person, in connection with the purchase and sale of securities; in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5.

## PURPOSE OF THE CONSPIRACY

21.     It was a purpose of the conspiracy for the conspirators to unlawfully enrich themselves by creating shell companies and falsely and fraudulently registering them with the SEC, so that the companies could issue shares which could be traded in the microcap or penny stock markets.   After obtaining approval for the shares of the companies to be publicly traded, the conspirators would secretly obtain control of all or nearly all of the free trading shares.   The conspirators would then sell the companies and the free trading shares at a profit to buyers who would then utilize the companies to engage in pump and dump stock swindles and other manipulation schemes.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

22.     **SHELDON R. ROSE**, Steven Sanders, Alvin S. Mirman, and Daniel McKelvey would recruit individuals to serve as straw CEOs for the Shell Companies.   These conspirators

6

would inform the straw CEOs that they would have no further role with the company and would be paid only when the company was later sold.   **ROSE**, Sanders, Mirman, and McKelvey would thereafter file incorporation documents with the State of Florida and obtain employer identification documents from the IRS, reflecting the name of the straw CEOs as the sole officers and/or directors of the companies.

23.    **SHELDON R. ROSE**, Steven Sanders, Alvin S. Mirman, and Daniel McKelvey would open bank accounts in the name of the Shell Companies, using funds and documents provided by the conspirators, but with the straw CEOs listed on the bank accounts.   These bank accounts would be controlled by **ROSE**, Sanders, Mirman, and McKelvey, and not typically accessed by the straw CEOs.

24.    **SHELDON R. ROSE**, Steven Sanders, Alvin S. Mirman, and Daniel McKelvey would prepare false and fraudulent corporate documents for the Shell Companies, such as board meeting minutes, stock certificates and shareholder lists.   The conspirators would then submit these false and fraudulent documents and other false information to the SEC on Forms S-1 in order to obtain effective registration of the Shell Companies.   After a company's registration was effective, **ROSE**, Sanders, Mirman, McKelvey and others would file current, periodic and annual reports for the Shell Companies on Forms 8-K, 10-K, and 10-Q.   These reports were required to be filed pursuant to 15 U.S.C. § 78m(a), or were filed pursuant to 15 U.S.C. § 78o(d).   The reports did not disclose the role of the conspirators with the respect to the Shell Companies or the true purpose of the companies.

25.    **SHELDON R. ROSE**, Steven Sanders, Alvin S. Mirman, and Daniel McKelvey would fraudulently place the straw CEOs' electronic signatures on the Forms S-1, 8-K, 10-Q, and 10-K that falsely represented that the straw CEO had reviewed and verified the accuracy of the information in the filing.

7

26.    **SHELDON R. ROSE**, Steven Sanders, Alvin S. Mirman, and Daniel McKelvey, would recruit approximately 24 nominee shareholders for each shell company that were purportedly unaffiliated with the company, and would assign an equal number of shares to each nominee shareholder.   This was done to make it appear that none of the nominee shareholders controlled 5% of the shares, facilitate a subsequent application to FINRA for the shares to be traded in the OTC Bulletin Board or pink sheet markets, and avoid reporting requirements pertaining to the eventual sale or transfer of these shares to a shell buyer.   In reality, the nominee shareholders were promised a fixed amount of money once the company was ready to be sold, and the shares were in fact controlled by **ROSE**, Sanders, Mirman, and McKelvey.

27.    After the registration of a shell company was deemed effective, a Form 211 would be prepared and submitted to FINRA to obtain approval for the company's shares to be publicly traded in the OTC Bulletin Board or pink sheet markets.   For many of the companies, beginning in approximately August 2010, **IAN C. KASS** would submit the Form 211 as well as follow-up communications to FINRA, which would include false and fraudulent information about the role of the straw CEO at the company, the purpose of the company, and the business operations of the company.

28.    **SHELDON R. ROSE**, Steven Sanders, Alvin S. Mirman, Daniel McKelvey, **IAN C. KASS**, and Conspirator A would seek buyers for the Shell Companies.   For an agreed upon price to be paid to **ROSE**, Sanders, Mirman, and McKelvey, the shell buyers would be offered the opportunity to purchase (a) control of the company and all of the restricted shares held in the name of the straw CEO, as part of a "reverse merger," and (b) all of the company's purportedly free trading shares that were held in the names of nominee shareholders, in a separate set of transactions.

8

29.     Conspirator A would provide legal opinions pursuant to Rule 144 for the purpose of removing the "restricted" legend on shares of various shell companies, that falsely and fraudulently represented that **SHELDON R. ROSE**, Steven Sanders, Alvin S. Mirman, Daniel McKelvey, or their immediate family members, were not "affiliates" of the Shell Entities. Conspirator A would thereafter transmit these false and fraudulent opinion letters to various stock transfer agents and broker-dealers, including **IAN C. KASS**, so that the shares could be sold in the public marketplace.

30.     Conspirator A would act as the closing attorney for many of the shell entity sales. The straw CEO of the Shell Company would be listed on paperwork as the client of Conspirator A, but Conspirator A would typically have no contact or retainer agreement with the straw CEO. Conspirator A would take direction from **SHELDON R. ROSE**, Steven Sanders, Alvin S. Mirman, or Daniel McKelvey with respect to all actions related to the transactions, including the disbursement of funds.   Conspirator A also would transmit his bills to, and receive payments for his services from, **ROSE**, Sanders, Mirman, or McKelvey.   Conspirator A would typically pay the Straw CEO a nominal portion of the shell company sale proceeds and, after subtracting funds for himself, pay the remaining funds to **ROSE**, Sanders, Mirman, and McKelvey.

31.     For many of the shell entities, Conspirator A would distribute the proceeds to the same conspirators for whom he had written an opinion letter indicating that they (or their immediately family member) were not an "affiliate" of the company pursuant to Rule 144.

32.     In certain instances, **SHELDON R. ROSE**, Steven Sanders, Alvin S. Mirman, and Daniel McKelvey would negotiate a sale price of a shell entity, along with the entire class of free trading shares, with Conspirator B and Conspirator C.   Conspirator B and Conspirator C acted as intermediaries for other persons who were conducting pump and dump stock swindles.

33.     To further assist with the scheme, **IAN C. KASS** executed Customer Stock Deposit Representation forms to deposit shares of the Shell Entities on behalf of the persons listed on the forms, that falsely represented that the listed customer was not an affiliate of the company and that the shares listed on the forms were not to be sold as part of any other payment or proposed sale of stock related to the company.   In truth and in fact, **KASS** executed these forms on behalf of **SHELDON R. ROSE**, Daniel McKelvey, Steven Sanders, Alvin Mirman, and their family members, knowing that the purportedly free trading shares listed on the forms were to be sold to a shell buyer.

34.     The transfer of the shell entity to the shell buyer, as well as the class of restricted shares, would be disclosed to the SEC and the public as a "reverse merger."   The transfer of the purportedly unrestricted shares to the shell buyer, typically to a separate person or entity designated by the buyer, would not be disclosed to the SEC and the public.   During the scheme, shares of the Shell Companies were purchased on the open market by investors, including investors located in Miami-Dade County.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one conspirator committed and caused to be committed, in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

1.     On or about March 9, 2009, Conspirator A executed a letter that opined that the restrictive legends pertaining to shares of Liquid Financial Engines, Inc., held by close family members of McKelvey and Sanders, could be removed, even though McKelvey was the listed CEO on the company's corporate filings, and Conspirator A distributed all of the proceeds of the sale of the company to McKelvey and Sanders.

10

2.      On or about February 26, 2013, Conspirator A executed a letter that falsely and fraudulently stated that 1,000,000 shares of Fan Sport, Inc., held by Daniel McKelvey, were freely tradeable because he was not an "affiliate" of the company as defined in Rule 144, even though Conspirator A distributed all the proceeds of the sale of Fan Sport, Inc., to Daniel McKelvey and Steven Sanders in equal amounts.

3.      On or about September 5, 2013, Conspirator C transmitted an email to **SHELDON R. ROSE** indicating that the shell buyer for UTCH agreed to purchase all of the free trading shares as part of the purchase of the shell entity.

4.      On or about October 7, 2013, **SHELDON R. ROSE** transmitted an email to **IAN C. KASS**, in Ft. Lauderdale, Florida, requesting to know the status of a prearranged trade of UTCH shares, that was part of the sale of the shell entity.

5.      On or about October 29, 2013, **IAN C. KASS**, in Ft. Lauderdale, Florida, at time stamp 16:50, transmitted an instant message to Individual A, directing the sale of 125,000 shares of UTCH, at $0.02, on behalf of Account Holder A.

6.      On or about October 29, 2013, **IAN C. KASS** in Ft. Lauderdale, Florida, at time stamp 16:50, transmitted an instant message to Individual A, directing the purchase of 125,000 shares of UTCH, at $0.02, on behalf of Account Holder B.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE
### (18 U.S.C. § 981(a)(1)(C))

1.      The allegations in the General Allegations section and the Manner and Means section of this Information are re-alleged and incorporated herein by reference for the purpose of alleging forfeiture to the United States of America, of property in which **SHELDON R. ROSE** and **IAN C. KASS** have an interest.

11

2.    Upon conviction of the offense alleged in this Information, **SHELDON R. ROSE** and **IAN C. KASS** shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offense of conviction.

3.    With respect to defendant **SHELDON R. ROSE**, the property subject to forfeiture includes, but is not limited to, $2,723,512.

4.    Pursuant to Title 21, United States Code, Section 853(p), made applicable through Title 28, United States Code, Section 2461, if any property described above as being subject to forfeiture, as a result of any act or omission of the defendant: cannot be located upon due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States to seek the forfeiture of other property of the defendant up to the value of the above-described forfeitable property, and it is intent of the United States to seek a forfeiture money judgment in that amount.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and the procedures set forth in Title 21, United States Code, Section 853, made applicable through Title 28, United States Code, Section 2461(c).

WIFREDO A. FERRER
UNITED STATES ATTORNEY

JERROB DUFFY
ASSISTANT UNITED STATES ATTORNEY

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO. _____

vs.

**CERTIFICATE OF TRIAL ATTORNEY\***

SHELDON R. ROSE and IAN C. KASS,

_____/    **Defendants.**

**Superseding Case Information:**

**Court Division:** (Select One)

| | |
|---|---|
| _X_ Miami | _____ Key West |
| _____ FTL | _____ WPB  _____ FTP |

New Defendant(s)       Yes _____    No _____
Number of New Defendants    _____
Total number of counts    _____

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:    (Yes or No)    NO_____
   List language and/or dialect    _____

4. This case will take _0_ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)               (Check only one)

| I | 0 to 5 days | X | Petty | _____ |
|---|---|---|---|---|
| II | 6 to 10 days | _____ | Minor | _____ |
| III | 11 to 20 days | _____ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | X |
| V: | 61 days and over | | | |

6. Has this case been previously filed in this District Court?  (Yes or No)  No
   If yes:
   Judge: _____    Case No. _____

   Has a complaint been filed in this matter?    (Yes or No)    No
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____    District of _____

   Is this a potential death penalty case? (Yes or No)    No

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    _____ Yes    X No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    _____ Yes    X No

_____

JERROB DUFFY
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. A5501106

\*Penalty Sheet(s) attached

REV 4/8/08

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **SHELDON R. ROSE**

**Case No**: _____

Count #: 1

Conspiracy to Commit Securities Fraud

Title 18, United States Code, Section 371

**\* Max. Penalty**:      Five (5) years' imprisonment

Count #:

_____

_____

**\*Max. Penalty:**

Count #:

_____

_____

**\*Max. Penalty:**

Count #:

_____

_____

**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** IAN C. KASS

**Case No:** _____

Count #: 1

Conspiracy to Commit Securities Fraud

Title 18, United States Code, Section 371

**\* Max. Penalty:**      Five (5) years' imprisonment

Count #:



**\*Max. Penalty:**

Count #:



**\*Max. Penalty:**

Count #:



**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Sheldon R. Rose, | ) | |
| | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year.  I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Ian C. Kass, | ) | |
| | ) | |
| _____ | ) | |
| *Defendant* | | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*